Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                               Plaintiffs,

           -against-

WILKINS WILLIAMS MEDICAL, P.C., WILKINS BARRY
WILLIAMS, M.D., and JOHN DOE DEFENDANTS "1"
through "10",

                               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (      )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants Wilkins Williams Medical, P.C. ("WWM"), Wilkins

Barry Williams, M.D. ("Williams"), and John Doe Defendants "1" through "10" ("John Doe

Defendants") (collectively, referred to hereinafter as the "Defendants"), hereby allege as follows:

## **NATURE OF THE ACTION**

1.      This action seeks to recover more than $240,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services for videonystagmus ("VNG") testing, transcranial doppler tests ("TDT"), and extracorporeal shockwave therapy ("ESWT")(collectively, referred to as the "Fraudulent Services").  The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $550,000.00 in pending no-fault insurance claims for the Fraudulent Services because:

(i)      the Fraudulent Services were allegedly provided by and billed through WWM, which is a medical practice not under the control and direction of Williams, but rather, was at all relevant times operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)     the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)     the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)      the Fraudulent Services, to the extent provided at all, were not provided by Williams or any other licensed physician, but by persons who were

unlicensed, and were neither directly supervised by Williams nor employed by him or by WWM.

3.     Specifically, Williams and WWM (hereinafter, "the Williams Defendants") in combination with the John Doe Defendants, engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO, alone, more than $810,000.00 through WWM for the alleged performance of the Fraudulent Services by unidentified persons, at thirteen (13) separate locations (hereinafter, the "Clinics"), in a five (5) month period, from July 8, 2021 through December 8, 2021. Notably, approximately six hundred (600) individual claim submissions were made to GEICO seeking payment of No-Fault benefits for the Fraudulent Services purportedly provided to more than one hundred ninety (190) different patients on sixty-four (64) different dates, all of which represented that Williams was the legitimate owner of WWM and that he allegedly performed all the Fraudulent Services. In truth, Williams performed none of the Fraudulent Services and did not legitimately operate, manage or control WWM in connection with the fraudulent scheme.

4.     In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.

5.     In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established.  Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – the service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment that is very costly and is not typically portable.

6.     The Defendants seized on these changes in the Fee Schedule (or lack thereof), and concocted a fraudulent treatment and billing scheme pursuant to which:

> (i)     unlicensed "technicians" and/or other individuals not employed by WWM would allegedly render the Fraudulent Services on an itinerant basis at multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with No-Fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

> (ii)    the unlicensed "technicians" and/or other individuals not employed by WWM would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services; and

> (iii)   the reports, documents containing stamped signatures, and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

7.     The fraudulent scheme concocted by the Defendants involved illegal referral and kickback arrangements with the owners and/or managers of Clinics to allow them to access a steady stream of patients so as to be able to fraudulently bill GEICO and other automobile insurers,

and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

8.     The success of the fraudulent scheme required coordination between the Williams Defendants and the John Doe Defendants. In furtherance of the fraudulent scheme, they took the following actions:

(i)     Williams allowed the John Doe Defendants to use his name, medical license and WWM to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

(ii)    The Williams Defendants associated with "processors", who are among the John Doe Defendants. Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics, (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance, and (iii) referring the no-fault billing and collection work to New York collection lawyers; and

(iii)   The Williams Defendants, through their association with the John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow them to access a steady stream of patients to be able to fraudulently bill GEICO and other automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

9.     Once the pieces were in place, the John Doe Defendants: (i) used Williams' medical license, the tax identification number of WWM, and electronic copies of Williams' signature to generate large quantities of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used WWM as a fictional healthcare "practice" to serve as a billing vehicle through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

10.    Because WWM was nothing more than a "shell" to hide the John Doe Defendants' participation in the scheme, it was equally critical to the success of the fraudulent scheme for the

Williams Defendants and the John Doe Defendants to partner with New York collection attorneys who were willing to:

>   (i)     purport to represent the physician and the billing entity;
>
>   (ii)    provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies that the attorney/law firm either owned or with whom they had relationships;
>
>   (iii)   pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and
>
>   (iv)    accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including the John Doe Defendants.

11.     At the time, the John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, the John Doe Defendants had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (*i.e.*, the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

12.     At the time, the John Doe Defendants used the information received from Williams to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records;  (ii) the engagement letter and associated documents needed by the collection lawyers to bill and collect on the Fraudulent Services; and (iii) the funding agreements to present to companies who were willing to advance money against the receivables (the "Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the John Doe Defendants as "advances"

against the claims submitted for the Fraudulent Services. The John Doe Defendants were not signatories to the funding agreements, received the money without risk, and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

13.     Additionally, the John Doe Defendants provided the package of documents associated with billing, collection and funding efforts to the collection lawyers and thereafter, began to transfer the fraudulent claim documents to the collection lawyers. Once the documents were processed by the collection lawyers into bills (i.e., "NF-3" forms) in the name of WWM, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment. The collection lawyers:

(i)     purported to represent Williams and WWM in thousands of writings sent to GEICO;

(ii)    arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the names of WWM;

(iii)   systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of WWM; and

(iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

14.     As discussed herein, the Defendants, at all relevant times, have known that: (i) WWM was not legitimately owned and/or controlled by Williams, but was operated, managed and controlled by the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv)

the Fraudulent Services were never provided, to the extent provided at all, by Williams but by persons who were never supervised by Williams or employed by WWM.

15.     The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO using the United States mail.

16.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

17.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to actively seek collection on pending charges for the Fraudulent Services.  As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $240,000.00.

## THE PARTIES

### I.    Plaintiffs

18.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

19.     Defendant Williams resides in and is a citizen of New York. Williams is a physician licensed to practice medicine.  Williams agreed to "front" as the legitimate owner and operator of WWM, while allowing the John Doe Defendants to use his license and WWM as a billing "vehicle" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

20.     Defendant WWM is a New York professional service corporation that purports to operate as a medical practice in New York. WWM was incorporated in New York in 2016 and identifies its principal place of business and operational location as 400 Liberty Avenue, 2nd Floor, Brooklyn, New York (the "Liberty Avenue Location").

21.     The John Doe Defendants are citizens of New York. The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Williams Defendants by: (i) unlawfully operating, managing and controlling WWM; (ii) establishing relationships with the laypersons associated with the Clinics; (iii) collecting the no-fault claims (i.e., the paperwork) from the Clinics for the Fraudulent Services; (iv) arranging for and providing the funding associated with the Fraudulent Services; and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

23.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

24.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

25.     GEICO underwrites automobile insurance in New York.

**I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement**

26.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

28.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

29.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

30.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

31.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York …. (Emphasis added).

32.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

33.     Unlicensed non-physicians may <u>not</u>: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

34.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals.  <u>See, e.g.</u>, New York Education Law §§ 6509-a; 6530(18); and 6531.

35.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. <u>See, e.g.</u>, New York Education Law § 6512, § 6530(11), and (19).

36.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

37.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

38.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

39.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

40.     In New York, claims for PIP Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

41.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner

in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

42.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Overview of the Defendants' Fraudulent Scheme

### A.     Williams and his Recruitment

43.     Williams is a physician who became licensed to practice medicine in New York in 2002. According to public record searches, Williams specializes in family medicine, and represents to the public that he treats patients through "Interfaith Medical Center" located at 880 Bergen Street, Brooklyn, New York.

44.     Williams was recruited by the John Doe Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise reimbursable services. Based on the arrangement, Williams would receive a periodic payment in exchange for allowing his name, license and the tax identification number of WWM to be used in connection with the fraudulent scheme and would contend that he supervised the Fraudulent Services, if any insurance company ever inquired.

45.     Williams was able to participate in this scheme with the John Doe Defendants by allowing the use of WWM, a medical practice that was formed in his name, but had not been used to bill GEICO and other New York automobile insurers as of the time of his recruitment by the John Doe Defendants.

46.     In 2016, Williams opened WWM as a professional medical practice and operated the professional corporation for a period of time. However, in 2021, when the John Doe Defendants recruited Williams to participate in the complex insurance fraud scheme that is the subject of this action, WWM was essentially dormant and not operating as a medical practice.

47.     In keeping with the fact that WWM was not operating at the time of Williams' recruitment in 2021, WWM was not in compliance with New York's requirement that professional corporations file their triennial statement with the New York State Department of Education, Division of Professional Licensing.   Since 2019, WWM has been out of compliance with this requirement.

48.     Also in keeping with the fact that WWM was not operating at the time of Williams' recruitment in 2021, WWM was no longer operating at the Liberty Avenue Location, the address on file with the New York State Department of State and Department of Education, Division of Professional Licenses. Instead, the Liberty Avenue Location was being operated by Brooklyn Community Services, East New York Family Center, an agency that provides services for individuals with special needs.

**B.     Gaining Access to Insureds**

49.     As WWM was not operating in 2021 but was a registered New York State professional medical corporation, WWM was the perfect "shell" to be used as the entity through

which Williams and the John Doe Defendants could effectuate their scheme to defraud GEICO and other New York automobile insurers.

50.     Prior to the use of WWM to further their scheme to defraud GEICO and other New York automobile insurers, WWM had never billed GEICO for providing any healthcare services or goods to any Insured.

51.     At the time that the fraudulent scheme commenced, WWM did not have any legitimate indicia: (i) it had no treatment location of any kind, (ii) was not the owner or leaseholder of and real property, (iii) did not employ any licensed professional or support staff, and (iv) did not advertise or market its services to the public.

52.     Instead, and to further the fraudulent scheme described herein, Williams ceded all control of WWM to the John Doe Defendants. Thereafter, the John Doe Defendants used the name and medical license of Williams to "operate" WWM on an itinerant basis from thirteen (13) separate Clinics, primarily located in Brooklyn and Nassau County, where they were given access to steady volumes of patients pursuant to unlawful referral arrangements, including the following:

| Clinic - Street Address | Clinic – County |
| --- | --- |
| 1847 Utica Ave | Brooklyn |
| 1 Fulton Ave | Nassau |
| 1122 Coney Island Ave | Brooklyn |
| 115 Meacham Ave | Nassau |
| 4009 Church Ave | Brooklyn |
| 37 Smith St | Nassau |
| 3207 Avenue V | Brooklyn |
| 14 North Main St | Rockland |
| 3805 Church Ave | Brooklyn |
| 280 Broadway | Orange |
| 66 42 Myrtle Ave | Queens |
| 85-55 Little Neck Parkway | Queens |
| 1674 East 22nd St | Brooklyn |

53.     To obtain access to the Clinics' patient base (i.e., the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

54.     The Clinics provided facilities for the Defendants, and at the same time hosted a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

55.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

56.     At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. The Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to a high volume of Insureds at the locations.

57.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent". These payments were in reality, kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinics' "representatives" to the Defendants for the performance of the Fraudulent Services.

58.     Once Defendants were given access, they subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services. In addition, the Insureds were directed by the Defendants to undergo phony testing that produced results that were medically impossible and to submit to purported services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

59.     The Clinics willingly provided access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and, therefore, catered to high volumes of Insureds at the locations.

60.     In keeping with the fact that the Clinics controlled the patient base and that WWM was simply one of several interchangeable "cogs" in an ongoing fraud wheel during the relevant time period, there were numerous occasions between July 2021 and December 2021 where WWM was: (i) allegedly providing the Fraudulent Services on Insureds at a Clinic location at the same time that other medical practices were performing the same Fraudulent Services on Insureds; and (ii) was one of multiple "providers" rendering the Fraudulent Services at specific Clinic locations in weekly sequences.

61.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

### C.     Defendants Place the Fraudulent Scheme in Motion

62.     Once all the necessary "pieces" were in place and Williams ceded control of WWM to the John Doe Defendants, WWM was used to bill GEICO and other New York automobile insurers millions of dollars for the performance of the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the fraudulent scheme.

63.     As part of the scheme, the John Doe Defendants arranged to have the account receivables associated with the billings to GEICO and other insurers for the Fraudulent Services "funded" through companies ("Funders") with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them rather than Williams.

64.     As a result of those efforts, the John Doe Defendants received hundreds of thousands of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk, because the John Doe Defendants were never signatories to the agreements. In addition, the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

65.     Through the funding and collection arrangement, the John Doe Defendants controlled WWM and all of its assets, and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the

Fraudulent Services.  The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

66.     In keeping with the fact that the John Doe Defendants used the collection lawyers to further the fraudulent scheme, an overwhelming majority of the 600 claims submitted to GEICO were accompanied by a letter or other communication from the collection layers, falsely representing that they represented Williams and WWM in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.  In reality, Williams played no role in retaining the collections lawyers.

**D.     The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

67.     The Fraudulent Services billed in the name WWM were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

68.     Neither Williams nor any other licensed physicians were ever involved in the performance of the Fraudulent Services.  Unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, the John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and

investigational, among other things, all solely to maximize profits without regard to genuine patient care.

69.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services, and the only point in having the Insureds seen by the unlicensed technicians was to get the Insureds signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers in order to generate bills and submit them to GEICO and other New York automobile insurers seeking payment for the Fraudulent Services to earn their compensation and generate money for the John Doe Defendants.

70.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment. Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, thereby permitting the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

71.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO and other New York automobile insurers.

### 1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

72.     Defendants purported to subject many Insureds to medically unnecessary, ESWT "treatments". To conceal the absence of any physician involvement and that WWM was just one

of several billing entities used at each Clinic, the John Doe Defendants arranged to have the services documented on a generic "form" that intentionally avoided referencing either Williams or WWM.  The following is a representative example:



73.     Of consequence, the "notes" associated with the ESWT treatments did not identify who performed the service but were submitted to GEICO by the collection lawyers with an NF-3 form that falsely represented that Williams performed the actual service. In fact, many of the "notes" associated with the ESWT treatments did not contain a signature under the "Doctor's Signature" line. Even more, when the "notes" contained a doctor's signature that purported to be Williams, Williams did not actually sign the "notes". Instead, many of the "notes" contained a photocopied signature that purported to belong to Williams.

74.     In addition, the data related to the bills submitted to GEICO corroborates the fraudulent nature of the billing/treatment protocols.  According to the billing, the ESWT treatments alleged to have been performed on Insureds between July 26, 2021 and December 8, 2021 purport to represent that: (i) over the course of 61 separate dates; (ii) more than 1,000 separate ESWT treatments were performed; (iii) the ESWT treatments were performed on more than 180 separate

patients; (iv) the ESWT treatments were performed at thirteen (13) separate locations; and (v) the ESWT treatments were provided at multiple locations at the same day, including instances where ESWT was allegedly performed at five (5) or more separate treatment locations on some days.

75.   For example:

(i)     The Defendants billed GEICO for purportedly providing ESWT treatments on November 17, 2021 to 20 different Insureds at five different Clinics, in three different counties in the New York Metropolitan area.

(ii)    The Defendants billed GEICO for purportedly providing ESWT treatments on November 9, 2021 to 19 different Insureds at six different Clinics, in three different counties in the New York Metropolitan area.

(iii)   The Defendants billed GEICO for purportedly providing ESWT treatments on November 3, 2021 to 17 different Insureds at five different Clinics, in three different counties in the New York Metropolitan area. In addition, the Defendants billed GEICO for also purportedly performing VNG and TDT testing on three additional Insureds at one additional Clinic.

(iv)    The Defendants billed GEICO for purportedly providing ESWT treatments on September 8, 2021 to 16 different Insureds at six different Clinics, in three different counties in the New York Metropolitan.

(v)     The Defendants billed GEICO for purportedly providing ESWT treatments on November 10, 2021 to 16 different Insureds at six different Clinics, in three different counties in the New York Metropolitan area. In addition, the Defendants billed GEICO for also purportedly performing VNG and TDT testing on three additional Insureds at two separate Clinics, including one additional Clinic.

(vi)    The Defendants billed GEICO for purportedly providing ESWT treatments on November 11, 2021 to 15 different Insureds at five different Clinics, in four different counties in the New York Metropolitan area.

(vii)   The Defendants billed GEICO for purportedly providing ESWT treatments on November 16, 2021 to 15 different Insureds at five different Clinics, in three different counties in the New York Metropolitan area.

(viii)  The Defendants billed GEICO for purportedly providing ESWT treatments on September 7, 2021 to 14 different Insureds at six different Clinics, in four different counties in the New York Metropolitan.

(ix)    The Defendants billed GEICO for purportedly providing ESWT treatments on August 31, 2021 to 11 different Insureds at five different Clinics, in three different counties in the New York Metropolitan. In addition, the

Defendants billed GEICO for also purportedly performing VNG and TDT testing on two additional Insureds at one Clinic.

(x)     The Defendants billed GEICO for purportedly providing ESWT treatments on September 9, 2021 to 10 different Insureds at six different Clinics, in four different counties in the New York Metropolitan.

76.     Once documented by the unidentified technicians, the Defendants then billed GEICO seeking payment for ESWT (i) in the name of WWM and using its tax identification number, and (ii) using CPT code 0101T.

## CATEGORY III CODES

**Medical Fee Schedule**

**0042T–0504T**

**Effective April 1, 2019**

| | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|
| ■ | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy | 2.78 | XXX | |

77.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set.  Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

78.      Furthermore, the ESWT treatment allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons. In the first instance, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature. In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it is not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

79.      Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report containing a stamped signature, not an actual signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

80.      For example, the Defendants typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)      Defendants purported to provide ESWT through WWM to an Insured named RD on October 28, 2021, only 11 days after the Insured's accident on October 17, 2021;

(ii)     Defendants purported to provide ESWT through WWM to an Insured named MH on November 2, 2021, only 13 days after the Insured's accident on October 20, 2021;

(iii)    Defendants purported to provide ESWT through WWM to an Insured named RP on November 8, 2021, only 9 days after the Insured's accident on October 30, 2021;

(iv)    Defendants purported to provide ESWT through WWM to an Insured named FL on November 9, 2021, only 9 days after the Insured's accident on October 31, 2021;

(v)     Defendants purported to provide ESWT through WWM to an Insured named SP on November 11, 2021, only 12 days after the Insured's accident on October 30, 2021;

(vi)    Defendants purported to provide ESWT through WWM to an Insured named JM on November 15, 2021, only 14 days after the Insured's accident on November 1, 2021;

(vii)   Defendants purported to provide ESWT through WWM to an Insured named JG on November 16, 2021, only 3 days after the Insured's accident on November 13, 2021;

(viii)  Defendants purported to provide ESWT through WWM to an Insured named DF on November 18, 2021, only 16 days after the Insured's accident on November 2, 2021;

(ix)    Defendants purported to provide ESWT through WWM to an Insured named CL on November 24, 2021, only 6 days after the Insured's accident on November 18, 2021; and

(x)     Defendants purported to provide ESWT through WWM to an Insured named AS on December 2, 2021, only 13 days after the Insured's accident on November 19, 2021.

81.     These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

(i)     On June 8, 2021, two Insureds – YJ and AR – were involved in the same automobile accident. Thereafter, YJ and AR both presented to the same Clinic located at 4009 Church Avenue, Brooklyn, New York (the "4009

Church Clinic"), and each purportedly received ESWT "treatments" through WWM;

(ii)     On July 5, 2021, two Insureds – TE and CJ – were involved in the same automobile accident. Thereafter, TE and CJ both presented to the same Clinic located at 37 Smith Street, Freeport, New York (the "Smith Street Clinic"), and each purportedly received ESWT "treatments" through WWM;

(iii)    On July 25, 2021, two Insureds – SS and TS – were involved in the same automobile accident. Thereafter, SS and TS both presented to the same Clinic located at 1122 Coney Island Avenue, Brooklyn, New York (the "Coney Island Avenue Clinic"), and each purportedly received ESWT "treatments" through WWM;

(iv)    On August 11, 2021, three Insureds – EA, JD, and JM – were involved in the same automobile accident. Thereafter, EA, JD, and JM presented to the same Clinic located at 1 Fulton Avenue, Hempstead, New York (the Fulton Avenue Clinic"), and each purportedly received ESWT "treatments" through WWM;

(v)     On August 13, 2021, three Insureds – JB, AF, and JL – were involved in the same automobile accident. Thereafter, JB, AF and JL presented to the same Clinic located at 1847 Utica Avenue, Brooklyn, New York (the "Utica Avenue Clinic"), and each purportedly received ESWT "treatments" through WWM;

(vi)    On August 19, 2021, two Insureds – BA and NJ – were involved in the same automobile accident. Thereafter, BA and NJ both presented to the Smith Street Clinic, and each purportedly received ESWT "treatments" through WWM;

(vii)   On September 18, 2021, two Insureds – AD and CD – were involved in the same automobile accident. Thereafter, AD and CD presented to the Utica Avenue Clinic, and each purportedly received ESWT "treatments" through WWM;

(viii)  On September 29, 2021, three Insureds – JG, VL, and JG – were involved in the same automobile accident. Thereafter, JG, VL and JG presented to the same Clinic located at 115 Meacham Avenue, Elmont, New York (the "Meacham Avenue Clinic"), and each purportedly received ESWT "treatments" through WWM;

(ix)    On October 12, 2021, four Insureds – WB, ED, RD, and VI – were involved in the same automobile accident. Thereafter, WB, ED, RD, and VI presented to the Meacham Avenue Clinic, and each purportedly received ESWT "treatments" through WWM; and

(x)     On October 31, 2021, two Insureds – FL and SL – were involved in the same automobile accident. Thereafter, FL and SL presented to the 4009 Church Clinic, and each purportedly received ESWT "treatments" through WWM.

82.     These are only representative examples. In all the claims identified in Exhibit "1", the Defendants falsely represented that the ESWT treatments were medically necessary, when in fact they were not medically necessary and were provided pursuant to predetermined fraudulent protocols and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

83.     In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing of the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

84.     Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code (and corresponding charge) for each section of the Insured's body to which the ESWT was performed:

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/09/2021 | 1 Fulton Ave, Hempstead, NY, 11550 | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy (Lumbar ) | 1 | 0101T | S 700 39 |
| 08/09/2021 | 1 Fulton Ave, Hempstead, NY, 11550 | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified, high energy (Ankle Left) | 1 | 0101T | S 700 39 |

TOTAL CHARGES TO DATE  $ 1400 78

85.     In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) times for each date of service.

86.     In all the claims identified in Exhibit "1" for ESWT testing, the Defendants falsely represented that the ESWT charges were (i) medically necessary, (ii) performed by Williams, and

(iii) appropriately charged, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2. The Fraudulent Charges for VNG Testing

87.     As with the charges for ESWT, Williams and the John Doe Defendants also subjected Insureds to useless VNG testing.  Between July 8, 2021 and November 10, 2021 (approximately four months), GEICO received more than $34,000.00 in bills from the collection lawyers for the alleged performance of VNG services on Insureds. The charges for the VNG tests were fraudulent in that the VNG tests were medically unnecessary and were performed, to the extent performed at all, pursuant to the fraudulent treatment and billing protocols and the payments provided to the Clinics.

88.     As part of the Defendants' fraudulent scheme using WWM, and like the fraudulent charges for ESWT, Williams and the John Doe Defendants systemically subjected Insureds to medically unnecessary VNG testing that were never performed by WWM or any other physician employed by WWM, and instead were performed by unlicensed technicians who were not employed or directly supervised by Williams.

89.     As with the charges for ESWT, the VNG tests were part of the fraudulent treatment and billing protocol to bill for medically unnecessary testing, which was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

90.     Once the Defendants subjected Insureds to the medically unnecessary VNG tests, they then typically billed GEICO for the performance of the VNG tests through WWM using CPT

codes 92537, 92540, 92546, 92547, and 92548, resulting in charges to GEICO typically of $1,086.38 per Insured per date of service.

91.     VNG consists of a combination of tests that can be used to determine the cause of a patient's vertigo or balance disorder.  In other words, VNG tests are not used to confirm the existence of dizziness or balance disorder, but rather to identify the origin of the condition in the relatively rare cases where it cannot be determined through an ear, nose, and throat ("ENT") or neurological medical examination. Generally, VNG tests are employed to determine the source of the generation of vertigo, i.e., the inner ear or brain.

92.     VNG tests should not be used as a first-line diagnostic procedure when a patient reports dizziness as the result of automobile accident trauma. A legitimate diagnostic process for a patient reporting dizziness following an automobile accident should begin with a history and physical examination, including an ENT and neurological examination.  VNG tests record involuntary eye movements, called nystagmus, using video imaging technology. The nystagmus is recorded and analyzed using sophisticated video goggles which are equipped with infrared video cameras. The patient wears these goggles while being subjected to various stimuli, which duplicates the extraocular movement portion of the physical examination.

93.     There are four main components to VNG testing: (i) the saccade test, which evaluates rapid eye movements between fixation points; (ii) the tracking test, which evaluates movement of the eyes as they pursue a visual target; (iii) the positional test, which measures eye movements associated with positions of the head; and (iv) the caloric test, which measures responses to warm or cold water or air circulated through the ear canal. The cameras record the eye movements and display them on a video/computer screen. This allows the physician to see

how the eyes move, which helps the physician assess the patient's balance, which in turn helps the physician assess the source of vertigo.

94.     To properly administer a VNG test, the patient must be prepared appropriately. This preparation typically requires 72 hours of abstention from medication (with the exception of heart, high blood pressure and anticonvulsant medications); 24 hours of abstention from stimulants such as caffeine, as well as alcohol; and three hours of food abstention. In addition, patients must be provided with a pre-test history and examination, to determine, among other things, the nature of the problematic symptoms and the patient's eye movements.

95.     The Insureds who purportedly received a VNG test from WWM never had a legitimate examination to determine if a VNG test was medically necessary.

96.     Instead, the VNG testing was performed pursuant to "referrals" directed by the Clinics' representatives, who were not licensed healthcare professionals, and who made the "referrals" as part of a pre-determined protocol and in furtherance of the illegal kickback and financial relationships established between the Clinics and the Defendants.

97.     To the extent any licensed healthcare provider conducted a medical history and examinations that assessed the Insureds' neurological symptoms and referred the Insureds for VNG testing, virtually none of the Insureds who allegedly received VNG testing WWM ever reported experiencing dizziness, imbalance, or vertigo in the examination reports that preceded the VNG testing.

98.     Moreover, even if an Insured reported the existence of some general form of dizziness or balance disorder, the VNG tests supposedly provided by WWM were medically unnecessary because the cause of the Insured's dizziness or imbalance could be readily identified

through the physical examinations and the patient histories that were purportedly conducted during every initial consultation and follow-up examination at each Clinic.

99.     Because VNG tests properly are limited to circumstances in which the origin of a patient's vertigo is unclear, there was no legitimate reason to use VNG tests where, as here, the origin was claimed to have been from a motor vehicle accident.

100.    In keeping with the fact that the VNG tests purportedly provided by WWM were medically unnecessary, no physician employed by WWM or healthcare provider associated with the Defendants were involved in performing or interpreting the VNG testing. Instead, as part of the Defendants' fraudulent scheme, once the Clinic representatives referred Insureds to WWM for VNG testing, unlicensed laypersons, at the direction of the John Doe Defendants, subjected the Insureds to purported VNG testing, without any involvement of Williams or any other physician employed by WWM.

101.    In also keeping with the fact that the VNG tests were not medically necessary and did not involve William or any other physician employed by WWM to perform or interpret the results, in the circumstance that the VNG tests produced a "positive" or "inconclusive result", the Insureds did not undergo any form of vestibular rehabilitation, balance retraining, or any other therapy to address the putative balance issues that were allegedly identified.

102.    As with the billing for ESWT, in all the claims identified in Exhibit "1" for VNG testing, the Defendants falsely represented that the VNG tests were performed by Williams and were medically necessary, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

### 3.    The Fraudulent Charges for TDT Testing

103.    Williams and the John Doe Defendants also purported to subject Insureds to useless TDT testing which was in turn billed through WWM.  Between July 8, 2021 and November 10, 2021 (approximately four months), the Defendants (through the collection lawyers) fraudulently submitted bills to GEICO seeking more than $56,000.00 for the alleged performance of TDT testing on Insureds. The charges for the TDT tests were fraudulent in that they tests were medically unnecessary and were performed, to the extent performed at all, pursuant to the payments that were made to the Clinics.

104.    As part of the Defendants' fraudulent scheme through WWM, and like the charges for the other Fraudulent Services, Williams and the John Doe Defendants systemically subjected Insureds to medically unnecessary TDT testing that were never performed by Williams, and instead were performed by unlicensed technicians or another physician employed by WWM, who were not directly supervised by William.

105.    As with the charges for ESWT and VNG tests, TDT tests were part of the fraudulent treatment and billing protocol to bill for medically unnecessary testing, which was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

106.    Once Defendants subjected Insureds to the medically unnecessary TDT tests, they then typically billed GEICO for the performance of the TDT tests in the name of WWM using CPT codes 93886, 93890 and 93892, resulting in charges to GEICO of $1641.79 per Insured per date of service.

107.    TDT is a noninvasive technique that uses sound waves to evaluate blood flow (blood circulation) in and around the brain.  TDT typically uses a doppler transducer that enables

recording of blood flow velocities from intracranial arteries through selected cranial foramina and thin regions of the skull. Mapping of the sampled velocities as a color display of spectra locates the major brain arteries in three dimensions.

108.    TDT obtains information about the physiology of blood flow through the intracranial cerebrovascular system. Depending on the type of measurement needed, TDT studies can take at least 45 minutes, if not more. TDT evaluation of the intracranial cerebrovascular system is generally used in connection with the following:

- Vasopasm, following a ruptured brain aneurysm;

- Sickle cell anemia, to determine a patient's risk of stroke;

- Ischemic stroke;

- Intracranial stenosis or blockage of the blood vessels;

- Cerebral microemboli; and/or

- Patent Foramen Ovale, a hole in the heart that doesn't close properly after birth, which may provoke embolic stroke.

109.    The symptomology of the above-named conditions includes sudden severe headache with no known cause; numbness, weakness, or paralysis of the face, arm, leg, or one side of the body; confusion; trouble speaking, seeing, or walking; and/or sudden dizziness, loss of balance, or loss of coordination. Headaches, dizziness, and head trauma by themselves are not indications for the performance of TDT studies of the intracranial cerebrovascular system.

110.    Moreover, in the event the Insureds did suffer from any such symptoms, the onset of those symptoms was neither sudden nor unexplained but rather a purported result of the motor vehicle accidents that caused the Insured to seek treatment at the No-Fault Clinics in the first instance. In a legitimate setting, if a physician needs to examine a patient's intracranial blood flow, he or she orders a magnetic resonance angiogram ("MR angiogram") or a computed tomography

angiogram ("CT angiogram"), both of which measure intracranial blood flow with more accuracy than TDT. Indeed, in the claims that were purportedly provided through WWM there were virtually no clinical indications for the performance of TDT in an outpatient setting.

111.    Like the VNG testing, the Insureds who purportedly received TDT from WWM never had a legitimate examination to determine if TDT was medically necessary.

112.    Instead, the TDT was performed pursuant to referrals made by the Clinic's representatives, who were not licensed healthcare professionals, and who made the referrals as part of a pre-determined protocol and illegal kickback and financial relationships between the Clinivs and the Defendants.

113.    In keeping with the fact that the TDT was performed pursuant to predetermined treatment protocols, not by any licensed healthcare provider, any medical examinations performed on Insureds at the Clinics often failed to screen for the symptoms that would even warrant a TDT.

114.    To the extent any licensed healthcare provider conducted a medical history and examinations, the examination did not assess the Insureds' head pain and neurological symptoms. In virtually all cases where the Defendants purported to provide TDT, the Insureds did not suffer any sort of injury as the result of the automobile accident that would warrant the TDT.

115.    As with the other Fraudulent Services, the TDT was rendered and billed pursuant to a fraudulent treatment and billing protocol that was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests. Indeed, even had the Insureds displayed symptoms warranting a TDT, in a legitimate clinical setting the practitioner would initially administer a transcranial doppler study of the intracranial arteries, billed under CPT 93886, and would only proceed to perform a vasoreactivity test, billed under CPT 93890, or a microemboli study, billed under CPT 93892 if the Insured displayed

symptomology warranting that additional testing. By contrast to the manner in which TDT would legitimately be performed and billed, WWM purported to provide all three studies on every Insured who received TDT.

116.   Moreover, and in keeping with the fact that all the purported TDT procedures were medically unnecessary and pursuant to a pre-determined treatment protocol, virtually every Insured who received TDT testing also purportedly received VNG on the same date.

117.   As with the other Fraudulent Services, the TDT was rendered and billed pursuant to the Defendants' fraudulent treatment and billing protocol that was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who supposedly were subjected to the tests.

118.   Further, and in keeping with the fact that the TDT tests purportedly provided by WWM were medically unnecessary, no physician or healthcare provider associated with the Defendants were involved in performing or interpreting the TDT testing. Instead, as part of the Defendants' fraudulent scheme, once the Clinic representatives referred Insureds to WWM for VNG testing, unlicensed laypersons, at the direction of the John Doe Defendants, subjected the Insureds to purported TDT testing, without any involvement of Williams or another physician employed by WWM.

119.   As with the billing for the other Fraudulent Services, in all the claims identified in Exhibit "1" for TDT, the Defendants falsely represented that the TDT were performed by Williams and were medically necessary, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols and were, therefore, not eligible to collect No-Fault Benefits in the first instance.

**E.      The Fraudulent Billing for Independent Contractor Services**

120.    The Defendants' fraudulent scheme also included the submission of claims to GEICO in the name of WWM seeking payment for services provided by individuals that it never employed.

121.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the billing provider itself, or by its employees.

122.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

123.    From July 2021 through December of 2021, approximately 600 separate bills were submitted to GEICO seeking payment for the Fraudulent Services performed by individuals other

than Williams, while falsely representing in almost every bill that Williams was the provider of the service in question. This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who performed the services and their relationship to the billing provider, who the John Doe Defendants were unlawfully operating and controlling.

124.     In fact, virtually every NF-3 form that was submitted to GEICO falsely represented that Williams, as the owner of the practice, performed the service.   The following is a representative example:

| 16  IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING. | | | | | |
|---|---|---|---|---|---|
| Treating Provider's Name | Title | Licence or Certificate No | Business Relation ( check applicable box) | | |
| | | | Employee | Independent Contractor | Other (specify) |
| Wilkins Williams | MD | 226203 | | | Owner |

17  IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

| Wilkins Williams | 226203 | MD |
|---|---|---|

125.     Additionally, every NF-3 form submitted to GEICO by collection lawyers at the request and direction of the Defendants falsely represented that Williams, as the owner of the practice, had reviewed and approved the billing for the services as well as the AOBs (assignment of benefits forms) that would have enabled direct payment to have been made to the sole proprietorship for services allegedly rendered to the patient.

126.     The following is a representative example of that part of the NF-3 form and AOB submitted by the collection lawyers to GEICO with respect to the claims for which reimbursement was sought:

TOTAL CHARGES TO DATE : $1,431.90

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING. | | | | | |
|---|---|---|---|---|---|
| Treating Provider's Name | Title | License or Certificate No. | Business Relation ( check applicable box) | | |
| | | | Employee | Independent Contractor | Other (specify) |
| Wilkins Williams | MD | 226203 | | | Owner |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

Wilkins Williams     226203     MD

| 18. IS PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION ? | YES | X | NO | |
|---|---|---|---|---|

19. ESTIMATE DURATION OF FUTURE TREATMENT     Not determined at this time

PATIENT:   Your health provider may agree to accept for health services performed directly from your insurer   (Authorization to Pay Benefits)    so that you are not required to make payment to the health provider at the time of service  Such agreement is optional on the part of the health provider and must be signed by both patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in item 20 of this form.

20. _____ (IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21)

I authorize payment of health benefits to the undersigned health care provider or supplier of services described below. I retain all rights, privileges and remedies to which I am entitled under Article 51 (The No-Fault provision) of the insurance law.

PRINT NAME _____     SIGNED _____
          Patient                                  Patient                Date

PATIENT:   Your health provider may agree to have you assign your right to No-Fault benefits from your insurer directly to your health provider   (Assignment of Benefits).    If you and your health provider agree to an assignment of benefits, you must both sign the agreement contained in #21 or the prescribed NF-AOB form or its equivalent. The language contained in the assignment of benefits is mandatory and may not be altered or avoided by any other language added to this agreement or other written agreement.

21. __X__ (IF YOU HAVE CHOSEN TO ASSIGN YOUR BENEFITS TO THE HEALTH PROVIDER BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN AUTHORIZATION TO PAY BENEFITS CONTAINED IN ITEM #20 ABOVE)

I hereby assign to the health care provider indicated below all right, privileges and remedies to payment for health care services provided by the assignor to which I am entitled under article 51 (the No-Fault statute) of the insurance law. The assignee hereby certifies that they have not received any payment from or on behalf of the assignor and shall not pursue payment directly from the assignor for services provided by said assignee for injuries sustained due to the motor vehicle accident, notwithstanding any other agreement to the contrary. This agreement may be withdrawn by the assignee when benefits are not payable based upon the assignor's lack of coverage and/or violation of a policy condition due to the actions or conduct of the assignor.

PRINT NAME     JOURDAIN YVON _____     SIGNED     Signature on File _____
                  Patient (Assignor)                             Patient          Date

PRINT NAME     Wilkins Williams _____     SIGNED     Signature on File _____
          Provider of Health Care Service (Assignee)             Provider of Health Care Service     Date

| Has an original authorization or assignment previously been executed? | X | Yes | | No |
|---|---|---|---|---|
| Is the original signature of the parties on file? | X | Yes | | No |

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR COMMERCIAL INSURANCE OR A STATEMENT OF CLAIM FOR ANY COMMERCIAL OR PERSONAL INSURANCE BENEFITS  CONTAINING MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, AND ANY PERSON WHO,

(00089)                              Page -  2                         NYS FORM N-F 3 (Rev. 1/2004)

---

9 30 21

PATIENT'S NAME : JOURDAIN YVON                    INVOICE NUMBER  0000406

IN CONNECTION WITH SUCH APPLICATION OR CLAIM, KNOWINGLY MAKES OR KNOWINGLY ASSISTS, ABETS, SOLICITS OR CONSPIRES WITH ANOTHER TO MAKE A FALSE REPORT OF THE THEFT, DESTRUCTION, DAMAGE OR CONVERSION OF ANY MOTOR VEHICLE TO A LAW ENFORCEMENT AGENCY, THE DEPARTMENT OF MOTOR VEHICLE OR AN INSURANCE COMPANY COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE VALUE OF THE SUBJECT MOTOR VEHICLE OR STATED CLAIM FOR EACH VIOLATION

| DATE | PROVIDER SIGNATURE | IRS/TIN IDENTIFICATION NO. | WCB RATING CODE IF NONE, SPECIALTY |
|---|---|---|---|
| 9/20/2021 | Wilkins Williams | TIN: 81-2781124 Lic# MD | 226203 |

127.    In fact, the statements in each of the NF-3 forms were false and fraudulent in that unlicensed technicians and/or individuals who performed the Fraudulent Services were never (i) employed by Williams or WWM; (ii) under Williams's direction and/or control; or (iii) paid by Williams. In fact, the individuals who performed the Fraudulent Services were also performing virtually identical services for other fraudulent "providers" that were operated and controlled by

the John Doe Defendants while they also purported to provide the Fraudulent Services on behalf of Williams and/or WWM.

128.   In fact, the unlicensed technicians and/or individuals were paid by the John Doe Defendants without regard to the physician's name or entity through whom the Fraudulent Services were billed.

129.   In keeping with the fact that the unlicensed technicians and/or individuals performed the Fraudulent Services under the operation and control of the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, virtually all of the Insureds identified in Exhibits "1" received ESWT from various providers, including WWM, at a single Clinic. For example:

    (i)     An Insured named CC was involved in an automobile accident on September 16, 2020. Thereafter, CC started treating at a Clinic located at 3027 Avenue V, Brooklyn, New York (the "Avenue V Clinic"), where purportedly received ESWT treatments from: (i) WWM by Williams; (ii) Pain Management, PLLC ("RPM") by Sady Ribeiro, M.D. ("Ribeiro"); and (iii) Chand Medical, PC ("Chand") by Rajesh Vindhya, M.D. ("Vindhya");

    (ii)    An Insured named RW was involved in an automobile accident on November 23, 2020. Thereafter, RW started treating at a Clinic located at 3805 Church Avenue, Brooklyn, New York (the "3805 Church Clinic"), where he purportedly received ESWT treatments from: (i) WWM and Williams; (ii) Chand Medical by Vindhya; (iii) New York Heritage Medical Service, PLLC ("NYHM") by Steve Opita, M.D. ("Opita"); and (iv) Big Apple Medical Services, P.C. ("Big Apple") by Andrew Davy, M.D. ("Davy");

    (iii)    An Insured named MP was involved in an automobile accident on February 4, 2021. Thereafter, MP started treating at the Fulton Avenue Clinic, where he purportedly received ESWT treatments from: (i) WWM and Williams; (ii) Chand by Vindhya; (iii) Big Apple by Davy; and (iv) KBJ Medical Practice, PC ("KBJ") by Kelvin Jack ("Jack");

    (iv)    An Insured named JJ was involved in an automobile accident on April 12, 2021. Thereafter, JJ started treating at the 4009 Church Clinic, where he purportedly received ESWT treatments from: (i) WWM and Williams; (ii) NYHM by Opita; (iii) Big Apple by Davy; and (iv) Forest Total Medical, PC ("Forest Total") by Terry Bonett, M.D, ("Bonett");

(v)     An Insured named SB was involved in an automobile accident on June 1, 2021. Thereafter, SB started treating at a Clinic located at 280 Broadway, Newburgh, New York (the "280 Broadway Clinic"), where she purportedly received ESWT treatments from: (i) WWM by Williams; and (ii) Big Apple by Davy;

(vi)    An Insured named MP was involved in an automobile accident on June 22, 2021. Thereafter, MP started treating at a Clinic located at 14 North Main Street, Spring Valley, New York (the "North Main Street Clinic"), where he purportedly received ESWT treatments from: (i) WWM by Williams; (ii) NYHM by Opita; and (iii) Big Apple by Davy;

(vii)   An Insured named TJ was involved in an automobile accident on July 19, 2021. Thereafter, TJ started treating at the Smith Street Clinic, where she purportedly received ESWT treatments from: (i) WWM by Williams; (ii) Medicine Mobile, P.C. ("Medicine Mobile") by Irena Pleskova, M.D. ("Pleskova"); (iii) Forest Total by Bonett; and (iv) Ilana Etelzon, M.D. ("Etelzon");

(viii)  An Insured named JS was involved in an automobile accident on September 24, 2021, Thereafter, JS started treating at the Utica Avenue Clinic, where she purportedly received ESWT treatments from: (i) WWM by Williams; (ii) KBJ by Jack; (iii) Sergey Kalitenko, M.D. ("Kalienko"); (iv) Pro-Medica, P.C. ("Pro-Medica") by Boris Sheinkerman, M.D. ("Sheinkerman"); and (v) Maxine Coles Services ("MCS") by Maxine Coles, M.D. ("Coles");

(ix)    An Insured named JE was involved in an automobile accident on September 25, 2021. Thereafter, JE started treating at the Coney Island Avenue Clinic, where he purportedly received ESWT treatments from: (i) WWM by Williams; (ii) Eric Kenworthy, M.D. ("Kenworthy"); (iii) Grace Medical Health Provider, P.C. ("Grace") by Opeoluwa Eleyinafe, M.D. ("Eleyinafe"); (iv) Olubusola Brimmo, M.D. ("Brimmo"); and (v) Harvey Levitan, M.D. ("Levitan"); and

(x)     An Insured named JB was involved in an automobile accident on November 3, 2021. Thereafter JB presented to the Meacham Avenue Clinic, where he purportedly received ESWT treatments from: (i) WWM by Williams; (ii) KBJ by Jack; and (iii) Pro-Medica by Sheinkerman.

130.    These are only representative samples.

131.    Because the Fraudulent Services were performed, to the extent they were provided at all, by individuals not employed by Williams and/or WWM, the Defendants never had any right to bill or to collect No-fault benefits for that reason or to realize any economic benefit from the

claims seeking payment for the Fraudulent Services, in addition to all the other reasons identified in this complaint.  The misrepresentations and acts of fraudulent concealment outlined in this complaint were consciously designed to mislead GEICO into believing that it was obligated to pay for the Fraudulent Services, when, in fact, GEICO was not obligated to pay for the Fraudulent Services.

## III.    **The Fraudulent Billing That Defendants Submitted or Caused to be Submitted to GEICO**

132.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted to GEICO hundreds of NF-3 forms, assignment of benefits forms and medical reports/records using the name of WWM and its tax identification number, and seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

133.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Defendants uniformly misrepresented that Williams had performed the Fraudulent Services and that his name, license and WWM were being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact the John Doe Defendants unlawfully and secretly controlled, operated and managed the professional corporation;

(ii)   The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of Defendants, uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)  The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of the Defendants, uniformly concealed the fact that the Fraudulent Services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements;

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and

(v)    The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants, uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Williams and/or WWM.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

134.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

135.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

136.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Williams in the performance of the Fraudulent Services, his control and management of WWM and the authority of the Defendants to use WWM and its tax identification number to perform the Fraudulent Services and to bill for and collect payments from GEICO for those Fraudulent Services.

137.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

138.    Furthermore, Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed

– to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

139.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals employed by Williams and/or WWM.

140.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $240,000.00 based upon the fraudulent charges.

141.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### AS AND FOR A FIRST CAUSE OF ACTION
**Against WWM**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

142.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 of this Complaint as if fully set forth at length herein.

143.    There is an actual case and controversy between GEICO on the one hand and WWM on the other hand regarding more than $550,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

144.    WWM has no right to receive payment from GEICO on the unpaid billing because (i) the Fraudulent Services were not provided by Williams or by any licensed healthcare professional, and (ii) the Fraudulent Services were allegedly performed and were billed through a medical professional corporation that was not legitimately owned or controlled by Williams, but rather was unlawfully and secretly owned, controlled and operated by the John Doe Defendants.

145.    WWM has no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

146.    WWM has no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

147.    WWM has no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided, to the extent that they were provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

148.    WWM has no right to receive payment from GEICO on the unpaid billing because the bills and associated documents submitted to GEICO fraudulently misrepresented and exaggerated the level of services that purportedly were provided to inflate the submitted charges.

149.    WWM has no right to receive payment from GEICO on the unpaid billing because the billing and associated documents submitted to GEICO fraudulently misrepresented that (i) the Fraudulent Services were performed by Williams when in fact they were performed, to the extent that they were provided at all, by unlicensed individuals who were neither supervised by nor employed by Williams or WWM.

150.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that WWM has no right to receive payment for any pending bills submitted to GEICO.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against Williams and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

151.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 of this Complaint as if fully set forth at length herein.

152.    WWM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

153.    Williams and the John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of WWM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted more than one thousand fraudulent charges seeking payments that WWM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was operated, managed, and controlled by the John Doe Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided

at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were medically unnecessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Williams but by unlicensed individuals who were neither supervised by nor employed by Williams or WWM.  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

154.    WWM's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to New York automobile insurers. The predicate acts of mail fraud are the regular way in which the Defendants operated WWM, inasmuch as WWM during the relevant time periods never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits from GEICO and other New York automobile insurers and acts of mail fraud therefore were essential in order for WWM to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that WWM has not been dissolved and Defendants continue to attempt collection on the fraudulent billing submitted through WWM to the present day.

155.    WWM is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These

inherently unlawful acts are taken by the Williams and the John Doe Defendants using WWM in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

156.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted by the Williams and the John Doe Defendants through WWM.

157.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A THIRD CAUSE OF ACTION
### Against Williams and the John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

158.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 of this Complaint as if fully set forth at length herein.

159.     WWM is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

160.     Williams and the John Doe Defendants are employed by and/or associated with WWM. Williams and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of WWM's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges to GEICO and other New York automobile insurers seeking payments that WWM was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants for purposes

of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were medically unnecessary and were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services,  to the extent provided at all, were not provided by Williams but by unlicensed individuals who were neither supervised by nor employed by Williams or WWM. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

161.    Williams and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other New York automobile insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

162.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted by Defendants through WWM.

163.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

164.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 143 of this Complaint as if fully set forth at length herein.

165.    Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

166.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Williams had performed the Fraudulent Services and that his name, medical license and the tax identification number of WWM were being legitimately used to bill for the Fraudulent Services, making them eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Williams never performed any of the services and the John Doe Defendants unlawfully and secretly owned, controlled, operated and managed WWM; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided, to the extent provided at all, were not medically necessary and were pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for

payment because the services were provided by Williams, when in fact the services were provided by unlicensed individuals that were never supervised by Williams or employed by WWM.

167.    Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through WWM that were not compensable under New York no-fault insurance laws.

168.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $240,000.00 pursuant to the fraudulent bills submitted by the Defendants.

169.    Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

170.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

171.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 141 of this Complaint as if fully set forth at length herein.

172.    As set forth above, Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

173.    When GEICO paid the bills and charges submitted by or on behalf of WWM for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants improper, unlawful, and/or unjust acts.

174.    Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

175.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

176.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $240,000.00.

## JURY DEMAND

177.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.    On the First Cause of Action against WWM, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that WWM has no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.    On the Second Cause of Action against Williams and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Williams and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against all Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $240,000.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

E.    On the Fifth Cause of Action against all Defendants, more than $240,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: August 4, 2022

RIVKIN RADLER LLP


By:   /s/ *Barry I. Levy*
             Barry I. Levy, Esq.
             Michael Vanunu, Esq.
             Allison N. Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*